United States District Court
Southern District of Texas
**ENTERED**
August 14, 2018
David J. Bradley, Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

DRAKE WATER TECHNOLOGIES, INC., §
                                §
      Plaintiff,                §
                                §
v.                              §    CIVIL ACTION NO. H-17-1704
                                §
NATIONAL OILWELL VARCO, L.P.,   §
                                §
      Defendant.                §

<u>**MEMORANDUM AND RECOMMENDATION**</u>

Pending before the court[1] are Plaintiff's Motion for Summary Judgment on Defendant's Counterclaims (Doc. 59), Defendant's Motion for Summary Judgment on Lost Profit Damages (Doc. 69), and Defendant's Motion for Partial Summary Judgment on Plaintiff's Claims (Doc. 73).  The court has considered the motions, all briefing and exhibits, and the applicable law.  For the reasons set forth below, the court **RECOMMENDS** that Plaintiff's motion be **GRANTED IN PART AND DENIED IN PART.**  The court **CONTINUES** Defendants' motions pending the completion of conflicts-of-law briefing as ordered below.

## I.  Case Background

This action arises out of a contract dispute between Plaintiff and Defendant over "the development of an industrial waste cleanup

---

[1]     This case was referred to the undersigned magistrate judge pursuant to 28 U.S.C. § 636(b)(1)(A) and (B), the Cost and Delay Reduction Plan under the Civil Justice Reform Act, and Federal Rule of Civil Procedure 72.  <u>See</u> Doc. 33, Ord. Dated June 13, 2017.

technology for use in the oil and gas industry."[2]  Plaintiff raised a multitude of claims, most of which are rooted in contract and quasi-contract theories of liability.

**A.**   **Factual Background**

Plaintiff is "in the business of conceiving, constructing, testing, and developing an assortment of industrial technologies," some of which are "new and novel inventions" that have been patented and others of which, according to Plaintiff, are not patentable.[3]  Defendant's FluidControl division "offers fluids for use on drill sites and solutions to manage the waste inevitably generated by oil and gas wells."[4]

According to Ron Drake, Plaintiff's president, and Vivian Drake, Plaintiff's chief operating officer, Defendant approached Plaintiff in 2013 regarding the use of Plaintiff's technologies related to oil-field cleanup.[5]  According to Michael Cowan ("Cowan"), vice president in Defendant's FluidControl division, it was Plaintiff that approached Defendant first to request "samples of waste from drilling operations in North Dakota so that [Plaintiff] could test some waste management technology it was

---

[2]      Doc. 48, Jt. Disc./Case Mgmt. Plan p. 2.

[3]      Doc. 60, Consolidated Aff. of Ron Drake & Vivian Drake ¶ 6.

[4]      Doc. 64, Aff. of Michael Cowan ("Cowan") ¶ 2.

[5]      See Doc. 60, Consolidated Aff. of Ron Drake & Vivian Drake ¶ 7.

developing."[6]   Regardless of which party made first contact, a relationship between Plaintiff and Defendant ensued that ultimately led to the execution, in February 2015, of a one-year agreement under which Defendant agreed to pay Plaintiff "to develop technologies of mutual interest" ("Consultant Agreement").[7]   The Consultant Agreement was the second contract between the parties concerning the treatment of industrial wastes generated by Defendant's clients.[8]

The Consultant Agreement stated that Defendant sought to engage the engineering services of Plaintiff "to provide certain engineering, testing and development services."[9]   The contract referred to Exhibit A for a list of the services to be performed and deliverables to be provided by Plaintiff and to Exhibit B for the list of Plaintiff's employees who would perform the contracted services.[10]   While Exhibit B did list the names of five employees with their positions and hourly billing rates, Exhibit A did not list services and deliverables.[11]   Instead, Exhibit A stated that,

---

[6]      Doc. 64, Aff. of Cowan ¶ 4.

[7]      Id. ¶ 5; see also Doc. 60-1, Ex. 1 to Consolidated Aff. of Ron Drake & Vivian Drake, Consultant Agreement p. 2; Doc. 65, Aff. of Pete Horn ("Horn") ¶ 3.

[8]      See Doc. 60, Consolidated Aff. of Ron Drake & Vivian Drake ¶ 7.  The parties also had previously entered a non-disclosure agreement.  See id.

[9]      Doc. 60-1, Ex. 1 to Consolidated Aff. of Ron Drake & Vivian Drake, Consultant Agreement p. 1.

[10]      See id.

[11]      See id. Exs. A & B.

3

due to the "multiple and varied projects" to be performed under the Consultant Agreement, "the parties [would] determine the scope of services to be provided and associated deliverables for each agreed scope of work" and would provide the details of those projects in separate documents that referenced the Consultant Agreement.[12]  In a section entitled "Inventions," the Consultant Agreement stated:

> 5.1    [Plaintiff] agrees to disclose and require its [project personnel] to promptly disclose to [Defendant] all inventions conceived or made as a result of or in performance of the services under this [a]greement . . . .  All rights, title and interest in and to such inventions shall belong to and are hereby assigned to [Defendant] or its designee. Further, [Plaintiff] agrees to execute or have its [project personnel] execute all documents and to perform or have performed all such other acts as [Defendant] may deem desirable or necessary to protect [Defendant's] or its designee's title to such inventions and to obtain and maintain patent coverage thereon throughout the world; provided, however, that [Plaintiff] may condition compliance with any such request on [Defendant's] agreement to reimburse [Plaintiff] for all reasonable expenses incurred in connection therewith.[13]

According to the Consultant Agreement, Defendant was to pay Plaintiff an advance of $40,000 on the first of each month.[14] Plaintiff was responsible for tracking the actual personnel hours

---

[12]    Id. Ex. A.  Following a meeting between Ron Drake and representatives of Defendant on March 4, 2015, Plaintiff drafted a version of Exhibit A that listed "'Action Items' to be addressed under the Consulting Agreement." See Doc. 60-4, Ex. 4 to Consolidated Aff. of Ron Drake & Vivian Drake, Confidential Draft of Ex. A Dated Mar. 6, 2015.

[13]    Doc. 60-1, Ex. 1 to Consolidated Aff. of Ron Drake & Vivian Drake, Consultant Agreement pp. 4-5.

[14]    See Doc. 60, Consolidated Aff. of Ron Drake & Vivian Drake ¶ 15; Doc. 60-1, Ex. 1 to Consolidated Aff. of Ron Drake & Vivian Drake, Consultant Agreement p. 1; Doc. 65, Aff. of Horn ¶ 4.

spent on the project each month and providing monthly statements for "the hours for which services [were] rendered hereunder with supporting documentation in sufficient detail to [Defendant's] satisfaction."[15]   Travel time and hours in excess of eight per day per employee were not to be compensated pursuant to the agreement.[16]

On a quarterly basis, the parties reviewed the actual personnel hours expended each month and reconciled the amounts Defendant had paid with the actual personnel hours provided.[17]   If the amount Defendant was obligated to pay Plaintiff based on the personnel hours rendered exceeded the advanced amount, Defendant was to pay Plaintiff the difference.[18]   Conversely, if Defendant had overpaid, Defendant was to reduce the subsequent month's advance accordingly or carry over the extra personnel hours.[19]

Additionally, Plaintiff was obligated to submit "[r]eimbursable expenses" to Defendant on a monthly basis.[20]   These expense statements were to be "in such form as [Plaintiff's

---

[15]     Doc. 60-1, Ex. 1 to Consolidated Aff. of Ron Drake & Vivian Drake, Consultant Agreement p. 2; see also Doc. 65, Aff. of Horn ¶ 4.

[16]     Doc. 60-1, Ex. 1 to Consolidated Aff. of Ron Drake & Vivian Drake, Consultant Agreement pp. 1, 2.

[17]     See Doc. 60, Consolidated Aff. of Ron Drake & Vivian Drake ¶ 15; Doc. 60-1, Ex. 1 to Consolidated Aff. of Ron Drake & Vivian Drake, Consultant Agreement p. 2; Doc. 65, Aff. of Horn ¶ 5.

[18]     See Doc. 60-1, Ex. 1 to Consolidated Aff. of Ron Drake & Vivian Drake, Consultant Agreement p. 2; Doc. 65, Aff. of Horn ¶ 5.

[19]     See Doc. 65, Aff. of Horn ¶ 5.

[20]     Doc. 60-1, Ex. 1 to Consolidated Aff. of Ron Drake & Vivian Drake, Consultant Agreement p. 2.

principal contact at Defendant] approve[d] with supporting documentation in sufficient detail to [Defendant's] satisfaction."[21] The Consultant Agreement specifically allowed "reasonable and necessary travel expenses" incurred in Plaintiff's role as consultant if pre-approved in writing and to the extent consistent with Defendant's "ordinary travel policy."[22] The parties identified no other reimbursable expenses in their agreement.[23] Per the Consultant Agreement, Defendant was to "pay non-disputed reimbursable expenses within 30 days" of Plaintiff's monthly submission.[24]

A choice-of-law provision stated, "This [a]greement, and any modifications to or extensions of this [a]greement, shall be construed under and governed by the laws of the State of Texas without regard to conflicts of law provisions."[25] An accompanying forum-selection clause stated that any action "arising out of or relating to" the Consultant Agreement was to be brought in a court in Harris County.[26] The Consultant Agreement also contained the following miscellaneous provision on waiver:

---

[21] Id.

[22] Id.

[23] See id.

[24] Id.

[25] Id. p. 5.

[26] Id.

> The waiver of any provision hereof will not be effective unless in writing and signed by the party against whom enforcement of such waiver is sought.  The waiver of a breach hereunder will not constitute a waiver of any other breach, nor will a single waiver constitute a continuing or subsequent waiver.[27]

Pursuant to the Consultant Agreement, Plaintiff "construct[ed] and operat[ed] several 'pilot' units using [Plaintiff's] technologies, in order to conduct waste sample testing and treatment demonstrations."[28]  ThermFlo, a pre-existing technology, was among those that Plaintiff used in its testing.[29]  Defendant described ThermFlo as "a mobile, thermal process for onsite remediation of organically contaminated solids derived primarily from residual oil-based mud."[30]  Plaintiff "construct[ed] and operat[ed] . . . a stationary ThermFlo pilot unit for testing the capability of ThermFlo to treat various waste products generated by [Defendant's] clients."[31]  Ron Drake described the engineering improvements made to ThermFlo during the Consultant Agreement as "minor" and "modest," not "sufficient[ly] innovati[ve] or unique[] to be worthy of patenting."[32]  Plaintiff conveyed as much to

---

[27]   Id.

[28]   Doc. 60, Consolidated Aff. of Ron Drake & Vivian Drake ¶ 8.

[29]   See id. ¶ 16.

[30]   Doc. 64, Aff. of Cowan ¶ 6; see also Doc. 60, Consolidated Aff. of Ron Drake & Vivian Drake ¶ 16.

[31]   Doc. 60, Consolidated Aff. of Ron Drake & Vivian Drake ¶ 16.

[32]   Id.

Defendant.[33]   None of Plaintiff's work pursuant to the Consultant Agreement "produced any inventions[] or any unique, non-obvious improvements," according to Ron Drake.[34]

All of Plaintiff's work under the Consultant Agreement was "authorized in advance pursuant to verbal, in-person, or other communication," and the work "produced successful results."[35]   Cowan described the data results from nine test runs of ThermFlo on waste from Defendant's drilling operations as "valuable and unique" and provided, as an example, one result concerning ThermFlo's ability to burn off both oil and chlorides from cuttings produced by drilling at a wellsite that was "unexpectedly discovered only after [Plaintiff] began testing the cuttings for [Defendant]."[36]

Vivian Drake asserted that Plaintiff consulted its contacts at Defendant "for advice and approval in advance concerning every question [Plaintiff] had about time and expense invoicing[, and all of the] invoices complied with what [Plaintiff] was told by [Defendant's] personnel."[37]   Pursuant to the terms of the contract, Plaintiff provided Defendant with an invoice for the $40,000 advance payment at the beginning of each month and invoices for

---

[33]     See id.

[34]     Id.

[35]     Id. ¶¶ 9, 15; see also Doc. 60-21, Ex. 21 to Consolidated Aff. of Ron Drake & Vivian Drake, ThermFlo Pilot Successes.

[36]     Doc. 64, Aff. of Cowan ¶¶ 7-8.

[37]     Doc. 60, Consolidated Aff. of Ron Drake & Vivian Drake ¶ 15.

that month's work near the end of the month.[38]  The monthly invoice for the advance payment stated only that the $40,000 was the monthly consulting fee.[39]  The invoices for completed work provided each employee's total hours performed under the Consultant Agreement for that month, as well as other expenses such as costs for travel, laboratory analysis, and materials with receipts attached.[40]  According to several of the emails accompanying the monthly invoices, "detailed invoice[s]" were promised to follow the monthly invoices after Vivian Drake had received "everyone's time sheets."[41]  Plaintiff also sent a "detailed quarterly 'true up' invoice."[42]  None of the invoices or accompanying emails provided the daily breakdowns of personnel hours and tasks.[43]

Except for an amount billed once due to a bookkeeping error, Defendant paid every invoice in full "without even once disputing any amount on any invoice."[44]  In total, Plaintiff charged Defendant

---

[38]   See id.; Doc. 65-2, Ex. B to Aff. of Horn, Emails, Invoices, & Receipts.

[39]   See, e.g., Doc. 65-2, Ex. B to Aff. of Horn, Emails, Invoices, & Receipts p. 28 of 76 (docket pagination).

[40]   See, e.g., id. p. 29 of 76 (docket pagination).

[41]   Id. pp. 5 of 76, 6 of 76 (docket pagination); see also, e.g., id. pp. 4 of 76, 8 of 76 (docket pagination).

[42]   Id. p. 21 of 76 (docket pagination); see, e.g., p. 26 of 76 (docket pagination).

[43]   See Doc. 65-2, Ex. B to Aff. of Horn, Emails, Invoices, & Receipts.

[44]   Doc. 60, Consolidated Aff. of Ron Drake & Vivian Drake ¶ 15; see also Doc. 65-2, Ex. B to Aff. of Horn, Emails, Invoices, & Receipts p. 9 of 76 (docket pagination)(challenging an invoiced amount that did not match corresponding receipt).

$713,039.20[45] for labor and expenses under the Consultant Agreement.[46]

Plaintiff kept track of the daily breakdowns of personnel hours and tasks on timesheets for each employee who worked on the Consultant Agreement: Doug Hahn, Mike Drake, Ron Drake, and Vivian Drake.[47] The time sheets were coded to reflect whether the employee's tasks related to the Consultant Agreement, to another project, or, more generally, to course of business.[48] For example, the time sheets reflected charges to the Consultant Agreement for Doug Hahn's 8.5 contract hours in one day for travel time, Ron Drake's 10.25 contract hours in one day including travel time, and Vivian Drake's 8.42 contract hours in one day including travel time.[49] Vivian Drake's time sheets indicate that she charged personnel hours to the Consultant Agreement for booking flights, making travel arrangements, preparing for trips, compiling presentation materials, compiling timesheets, preparing invoices, providing airport transportation for Ron Drake and others, and

---

[45]     Vivian Drake testified that the total paid under the terms of the Consultant Agreement was $600,785. See id.; Doc. 60-5, Ex. 5 to Consolidated Aff. of Ron Drake & Vivian Drake, Invoice Spreadsheet.

[46]     See Doc. 65, Aff. of Horn ¶ 7.

[47]     See Doc. 65-3, Ex. C to Aff. of Horn, Timesheets. Syris Trahan was listed, in addition to these four employees, on Exhibit B to the Consultant Agreement, but no time sheets are in the record for his work. See id.

[48]     See id.

[49]     See id. pp. 68 of 330, 193 of 330, 281 of 330 (docket pagination).

running errands.[50]  The time sheets were "available on request," but the record does not indicate whether Defendant requested the time sheets or when Defendant first received them.[51]

The vice president of finance for Defendant's WellSite Services, Pete Horn ("Horn"), testified that Defendant reviewed Plaintiff's timesheets and invoices near the inherent termination date of the Consultant Agreement and purportedly discovered three categories of improper charges: (1) 21.34 hours of travel time in the amount of $3,385; (2) multiple hours of work per person in excess of eight hours per day in an amount of at least $4,292.55; and (3) 134.69 hours of administrative and overhead expenses, including "packing for trips, uploading files to Dropbox, billing, creating timesheets, and reserving hotels," in the amount of $17,058.15.[52]  These charges totaled $24,735.70.[53]  According to Horn, Defendant discussed these charges internally in 2016 but decided not to pursue claims against Plaintiff at that time.[54] Defendant did not raise these billing issues or any performance issues during the performance of the Consultant Agreement or any

---

[50]    See, e.g., id. pp. 252 of 330, 254 of 330, 273 of 330, 281 of 330, 302 of 330, 326 of 330 (docket pagination).

[51]    See, e.g., Doc. 65-2, Ex. B to Aff. of Horn, Emails, Invoices, & Receipts pp. 15 of 76, 35 of 76 (docket pagination).

[52]    Doc. 65, Aff. of Horn ¶¶ 8-11; see also Doc. 65-3, Ex. C to Aff. of Horn, Timesheets.

[53]    See Doc. 65, Aff. of Horn ¶ 12.

[54]    See id. ¶¶ 2, 13.

11

other contract between the parties.[55]

Thereafter, Defendant did not express interest in extending the Consultant Agreement or other completed contracts, prompting Vivian Drake to resubmit "an old application to [the] North Dakota [Industrial Commission ("NDIC")] for grant money to field-demonstrate a ThermFlo unit" and to inquire whether Defendant was interested in participating.[56]   Defendant "agreed[] and formally promised its support and a major financial contribution."[57]   In August 2016, the NDIC approved Plaintiff's grant, but the relationship between Plaintiff and Defendant deteriorated after Plaintiff began working on the grant obligations, which led to Plaintiff's filing suit against Defendant.[58]

**B.   <u>Procedural Background</u>**

Plaintiff filed this action on February 23, 2017, in Montana First Judicial District Court.[59]   On March 28, 2017, Defendant removed the action on the basis of diversity jurisdiction.[60]   On

---

[55]      <u>See</u> Doc. 60, Consolidated Aff. of Ron Drake & Vivian Drake ¶ 14.

[56]      <u>Id.</u> ¶ 10; <u>see also</u> Doc. 60-20, Ex. 20 to Consolidated Aff. of Ron Drake & Vivian Drake, C&E Reclamation, Inc.'s 2014 Grant Application to NDIC.

[57]      Doc. 60, Consolidated Aff. of Ron Drake & Vivian Drake ¶ 10.

[58]      <u>See id.</u> ¶¶ 11, 12.   Ron and Vivian Drake described Defendant's behavior during the souring of the relationship as "get[ting] cold feet," "insist[ing] on major new terms," and "render[ing] the project impossible."   <u>Id.</u> ¶ 12.

[59]      <u>See</u> Doc. 1-2, Ex. B to Def.'s Not. of Removal, State Ct. Compl.; Doc. 35, Def.'s Post-Removal Statement.

[60]      <u>See</u> Doc. 1, Def.'s Not. of Removal; Doc. 35, Def.'s Post-Removal Statement p. 1.

April 4, 2017, Defendant moved for an order transferring the case from the U.S. District Court for the District of Montana, Missoula Division, to this district pursuant to the contractual forum-selection clause.[61]   Prior to submission of that motion to the court, the parties continued filing and amending pleadings.[62]   Also during that time, the parties attempted mediation but were unsuccessful.[63]   On May 31, 2017, the court granted Defendant's motion and, on June 2, 2017, the court transferred the case to this district.[64]

In July 2017, the parties met telephonically to discuss discovery and case management.[65]   In the report of that meeting, the parties acknowledged that they "may have some dispute on choice of law issues on some counts of each party's claims" but did not know at that time whether or to what extent those issues would come into play.[66]

Plaintiff moved for leave to amend its complaint pursuant to

---

[61]   See Doc. 5, Def.'s Mot. to Transfer.

[62]   See Doc. 9, Def.'s Ans., Affirmative Defenses, & Countercls.; Doc. 11, Pl.'s Am. Compl. & Jury Demand; Doc. 17, Pl.'s Ans. to Countercls.; Doc. 18, Def.'s Ans. to Am. Compl.

[63]   See Doc. 48, Jt. Disc./Case Mgmt Plan p. 5; Doc. 70, Pl.'s Report Concerning Mediation/Alternative Dispute Resolution p. 2.   Plaintiff reported that "[t]he parties were unable to reach agreement on any matter" and that "the mediation . . . was ineffective[] and largely useless to both parties."   Doc. 70, Pl.'s Report Concerning Mediation/Alternative Dispute Resolution p. 2.

[64]   See Doc. 25, Min. Entry Dated May 31, 2017; Doc. 28, Ord. Dated June 2, 2107.

[65]   See Doc. 48, Jt. Disc./Case Mgmt Plan.

[66]   Id. p. 6.

Federal Rule of Civil Procedure 15 and attached a proposed second amended complaint.[67]   On August 11, 2017, the court granted Plaintiff's motion and entered Plaintiff's proposed second amended complaint.[68]   Four days later, without leave of court, Plaintiff filed a third amended complaint in which Plaintiff added three causes of action to its second amended complaint and included other modifications.[69]

In the third amended complaint, Plaintiff asserted the following claims as arising under Montana law: (1) promissory estoppel; (2) equitable estoppel; (3) breach of the contractual covenant of good faith and fair dealing; (4) breach of surety obligations; (5) constructive fraud; and (6) negligent misrepresentation.[70]   Plaintiff also asserted: (1) breach of the contract concerning the NDIC grant project without reference to any specific state's laws; and (2) breach of obligations arising under the Uniform Commercial Code.[71]   Plaintiff sought actual damages in an amount in excess of $2 million; punitive damages in an amount not exceeding $10 million or three percent of Defendant's worth, whichever is less; and declaratory judgment that Defendant

---

[67]   See Doc. 50, Pl.'s Mot. for Leave to Am. Complaint.

[68]   See Doc. 53, Ord. Dated Aug. 11, 2017; Doc. 54, Pl.'s 2nd Am. Comp. & Jury Demand.

[69]   See Doc. 55, Pl.'s 3d Am. Compl.

[70]   See id. pp. 11-15.

[71]   See id. pp. 13, 15-16.

14

materially breached the NDIC agreement, that Defendant repudiated the NDIC agreement, and that Plaintiff is excused from further performance of the NDIC agreement.[72]

Defendant did not move to strike Plaintiff's Third Amended Complaint as filed without leave of court and, in fact, filed a timely answer and counterclaims to that amended complaint.[73] Therein, Defendant challenged Plaintiff's reliance on Montana law, arguing that Texas law governed the dispute pursuant to the terms of the Consultant Agreement.[74] Defendant also asserted more than thirty affirmative defenses and the following counterclaims: (1) breach of the Consultant Agreement by failing "to assign all rights, title, and interest in inventions conceived or made as a result of or in performance of the services" thereunder; and (2) breach of the Consultant Agreement by billing and receiving payment for charges that were not compensable under the Consultant Agreement.[75] Defendant also sought a declaratory judgment that Defendant owns the ThermFlo pilot unit and all other inventions it paid Plaintiff to develop.[76]

Plaintiff filed an answer to Defendant's counterclaims raising

---

[72]   See id. pp. 11, 16-17.

[73]   See Doc. 56, Def.'s 1st Am. Ans. & Countercls.

[74]   See id. p. 11.

[75]   Id. pp. 8-11; 16-19.

[76]   See id. pp. 16-17.

multiple affirmative defenses and purportedly also asserting the following additional "counter-counterclaims:" (1) breach of contract/declaratory judgment; (2) attorneys' fees for declaratory judgment; and (3) attorneys' fees for frivolous claims.[77] Defendant amended its pleading in order to respond to Plaintiff's counter-counterclaims.[78]

In January 2018, Plaintiff filed the pending motion for summary judgment on Defendant's counterclaims.[79]  In March 2018, Defendant filed the pending motion for summary judgment on lost profit damages, and, in April 2018, filed the pending motion for summary judgment on all but one of Plaintiff's claims and on punitive damages.[80]  The pending motions are all fully briefed.

## II.  Summary Judgment Standard

Summary judgment is warranted when the evidence reveals that no genuine dispute exists on any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Stauffer v. Gearhart, 741 F.3d 574, 581 (5th Cir. 2014).  A material fact is a fact that is identified by applicable substantive law as critical

---

[77]    See Doc. 57, Pl.'s Ans. to Def.'s Ans. & Countercls. to Def.'s Countercls. pp. 12-14, 16-18.

[78]    See Doc. 58, Def.'s 2d Am. Ans. & Countercl.

[79]    See Doc. 59, Pl.'s Mot. for Summ. J. on Def.'s Countercls.

[80]    See Doc. 69, Def.'s Mot. for Summ. J. on Lost Profit Damages; Doc. 73, Def.'s Mot. for Partial Summ. J. on Pl.'s Cls.

to the outcome of the suit.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Ameristar Jet Charter, Inc. v. Signal Composites, Inc., 271 F.3d 624, 626 (5th Cir. 2001).  To be genuine, the dispute regarding a material fact must be supported by evidence such that a reasonable jury could resolve the issue in favor of either party.  See Royal v. CCC & R Tres Arboles, L.L.C., 736 F.3d 396, 400 (5th Cir. 2013)(quoting Anderson, 477 U.S. at 248).

The movant must inform the court of the basis for the summary judgment motion and must point to relevant excerpts from pleadings, depositions, answers to interrogatories, admissions, or affidavits that demonstrate the absence of genuine factual issues.  Celotex Corp., 477 U.S. at 323; Topalian v. Ehrman, 954 F.2d 1125, 1131 (5th Cir. 1992).  The movant may meet this burden by demonstrating an absence of evidence in support of one or more elements of the case for which the nonmovant bears the burden of proof.  See Celotex Corp., 477 U.S. at 322; Exxon Corp. v. Oxxford Clothes, Inc., 109 F.3d 1070, 1074 (5th Cir. 1997).  If the moving party carries its burden, the nonmovant may not rest on the allegations or denials in his pleading but must respond with evidence showing a genuine factual dispute.  Stauffer, 741 F.3d at 581 (citing Hathaway v. Bazany, 507 F.3d 312, 319 (5th Cir. 2007)).

### III. Plaintiff's Motion for Summary Judgment

All three of Defendant's counterclaims are rooted in the terms of the Consultant Agreement and depend on proper interpretation of

17

its provisions.   Therefore, the court begins with the applicable contract law.

## A.   **Contract Interpretation**

Despite various choice-of-law disagreements, the parties agree that Texas law applies to the construction of the Consultant Agreement.[81]   The rules for the interpretation of contracts under Texas law are well settled.   In construing a written contract, the primary concern of the court is to reveal the contracting parties' intentions as expressed in the instrument.   State Farm Lloyds v. Page, 315 S.W.3d 525, 527 (Tex. 2010); Gulf Ins. Co. v. Burns Motors, Inc., 22 S.W.3d 417, 423 (Tex. 2000).   To this end, the court reads all parts of the contract as a whole and gives effect to each word, clause, and sentence so that no part of the agreement is rendered inoperative.   State Farm Lloyds, 315 S.W.3d at 527. Courts construe terms in contracts to have their plain, ordinary meaning unless something in the contract itself indicates that the parties intended for them to have particular definitions.   See Tanner v. Nationwide Mut. Fire Ins. Co., 289 S.W.3d 828, 831 (Tex. 2009).

When a contract as worded can be given "a definite or certain legal meaning," then it is unambiguous, and the court enforces it as written.   WBCMT 2007 C33 OFFICE 9720, L.L.C. v. NNN Realty

---

[81]   See Doc. 61, Pl.'s Brief Supporting Mot. for Summ. J. on Def.'s Countercls. p. 6; Doc. 63, Def.'s Resp. to Pl.'s Mot. for Summ. J. on Def.'s Countercls. p. 6.

_Advisors, Inc._, 844 F.3d 473, 478 (5th Cir. 2016)(applying Texas law). Absent any ambiguity, the meaning imparted by the language used in the contract can be decided as a matter of law. _Gulf Ins. Co._, 22 S.W.3d at 423.

## B. Discussion

Defendant alleged two breaches of the Consultant Agreement, one regarding the rights to inventions resulting from Plaintiff's performance of services thereunder and one regarding billing for those services. Defendant also requested a declaratory judgment that it owns the ThermFlo pilot unit and all other inventions it paid Plaintiff to develop pursuant to the terms of the Consultant Agreement. The breach of contract claim and the declaratory judgment are ineluctably related as both concern invention rights.

### 1. Inventions

The Consultant Agreement required Plaintiff to disclose all inventions "conceived or made" while performing the contract services and assigned all rights in those inventions to Defendant.[82] Plaintiff was obligated to execute documents and to take other steps necessary to protect Defendant's title in those inventions and "to obtain and maintain" patent coverage for those inventions throughout the world.[83] Beyond the characteristics described in

---

[82]   Doc. 60-1, Ex. 1 to Consolidated Aff. of Ron Drake & Vivian Drake, Consultant Agreement p. 4.

[83]   _Id._ pp. 4-5.

this section, the word "invention" was not defined in the Consultant Agreement.  Be that as it may, the language in the section itself particularized the meaning of the term in several ways.  First, the covered inventions were those that were conceived or made.  Second, the inventions were of a nature that steps could be taken to protect Defendant's rights to title.  Finally, Plaintiff was obligated to "obtain and maintain" patents throughout the world on these inventions.[84]

Based on the language of the contract itself, the unavoidable deduction about the parties' intent is that they meant "invention" to refer to something conceived or made that was protectable and patentable.  The United States Code explains the term "[i]nventions patentable" as "any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof."  35 U.S.C. § 101.  Because the Consultant Agreement unambiguously indicated that the parties intended a more particular definition of "invention" than its plain, ordinary meaning, the court need not resort to dictionary definitions.  See Tanner, 289 S.W.3d at 831.

Plaintiff contends that no inventions resulted from its work under the Consultant Agreement.  Defendant argues that the test "results and data concerning ThermFlo's technical capabilities" were "something new" that qualified as inventions under the

---

[84]    Id.

contract terms.[85]  Defendant specifically points to a "significant discovery about ThermFlo's ability to burn off both oil and chlorides," which "improved ThermFlo's potential to be commercially viable."[86]

Pursuant to the court's construction of the term "invention," test results and data were not covered by the contract because they were not conceived or made by Plaintiff and were not a process, machine, manufacture, composition of matter, or any new and useful improvement.  Moreover, a discovery about ThermFlo's abilities is not something conceived or made by Plaintiff; Defendant does not argue that Plaintiff made specific new and useful improvements to the existing ThermFlo technology that enabled it to burn both oil and chlorides, only that Plaintiff discovered that ability through testing.  Finally, the qualities of newness, commercial viability, uniqueness, and significance do not transform testing results and data or a discovery into something conceived or made by Plaintiff that is protectable and patentable.

Defendant's breach-of-contract claim and declaratory-judgment

---

[85]    Doc. 63, Def.'s Resp. to Pl.'s Mot. for Summ. J. on Def.'s Countercls. pp. 4, 8.  In another part of its responsive brief, Defendant states that it is asserting "its ownership interest in the testing data and results it paid for under the Consultant Agreement."  Id. p. 6.
     In its pleading, Defendant's declaratory-judgment request asserts ownership over the ThermFlo pilot unit but makes no argument in its responsive brief that the pilot unit fit within the contractual meaning of "invention."  Although the pilot unit was constructed by Plaintiff, it relied on technology that pre-existed the Consultant Agreement and, therefore, was presumably unpatentable.  Defendant makes no contrary argument, apparently abandoning that claim.

[86]    Doc. 63, Def.'s Resp. to Pl.'s Mot. for Summ. J. on Def.'s Countercls. p. 4.

request related to the inventions section of the Consultant Agreement cannot survive summary judgment.

## 2. Billing[87]

The parties agree that the Consulting Agreement was not the complete and final agreement between the parties. Plaintiff notes that "the agreement was an open-ended contract with no included instruction" as to what was to be done with the advanced funds and that it "outsource[d] crucial questions on [travel and administrative expenses] to [Defendant's] subjective approval and other extrinsic evidence."[88] Defendant "agrees with [Plaintiff] that the Consultant Agreement [was] a partially integrated agreement" that left open "what specific services were to be included" in the definitions of "engineering, testing, and development services" performed by Plaintiff pursuant to the contract.[89]

The Consultant Agreement clearly disallowed reimbursement of travel time and personnel time in excess of eight hours per day per

---

[87]     The Consultant Agreement contained the following limitation on expenses billed: "However, in no event shall the actual charges exceed 15% of the Advance, unless approved in writing by [Defendant] prior to the charges being accrued by [Plaintiff]." Doc. 60-1, Ex. 1 to Consolidated Aff. of Ron Drake & Vivian Drake, Consultant Agreement p. 2. In its live pleading, Defendant alleged that Plaintiff breached this provision as well but failed to respond to Plaintiff's arguments in favor of summary judgment on that issue. The court views Defendant's failure to address the fifteen-percent provision as an abandonment of that aspect of its breach of contract claim.

[88]     Doc. 61, Pl.'s Brief Supporting Mot. for Summ. J. on Def.'s Countercls. pp. 20, 21.

[89]     Doc. 63, Def.'s Resp. to Pl.'s Mot. for Summ. J. on Def.'s Countercls. pp. 13-14.

person.  However, it did not explicitly authorize the reimbursement of administrative or overhead expenses.  Plaintiff does not argue that these categories of hours and expenses were reimbursable pursuant to the parties' written agreement.  In fact, Plaintiff concedes that the contract was silent on administrative expenses.  Plaintiff's position is that the Consultant Agreement deferred such matters to Defendant's subjective approval in advance.  Plaintiff argues that it communicated with its contacts for advice and approval of every expense about which it had a question and that all of its invoices complied with both the answers it received from Defendant and the Consultant Agreement.

Plaintiff's assertions are not supported by the summary judgment record.  The evidence shows that Plaintiff logged personnel hours for travel time and for time in excess of eight hours per day.  The Consultant Agreement explicitly prohibited billing for those hours.  Plaintiff points to no evidence that the parties effectively amended the agreement to allow for the hours in that category for which Plaintiff billed Defendant.  Although Vivian Drake asseverated that she sought approval for all questionable charges, Plaintiff submits no evidence of specific communications with Defendant detailing the challenged hours Defendant's approval of billing for those hours.  The same is true of the hours Vivian Drake logged for administrative tasks.

Regardless of whether Plaintiff improperly billed certain

23

hours and expenses, Plaintiff contends that Defendant waived all claims to the alleged overcharges.  The Supreme Court of Texas has consistently defined waiver as "an intentional relinquishment of a known right or intentional conduct inconsistent with claiming that right." Crosstex Energy Servs., L.P. v. Pro Plus, Inc., 430 S.W.3d 384, 391 (Tex. 2014)(quoting Sun Exploration & Prod. Co. v. Benton, 728 S.W.2d 35, 37 (Tex. 1987)); see also Addicks Servs., Inc. v. GGP-Bridgeland, LP, 596 F.3d 286, 298 (5th Cir. 2010)(applying Texas law).  Intent is the key in determining whether a party waived a right.  See Crosstex Energy Servs., L.P., 430 S.W.3d at 393; Addicks Servs., Inc., 596 F.3d at 298.

"[F]or implied waiver to be found through a party's actions, intent must be clearly demonstrated by the surrounding facts and circumstances." Addicks Servs., Inc., 596 F.3d at 298 (quoting Jernigan v. Langley, 111 S.W.3d 153, 156 (Tex. 2003)); see also Crosstex Energy Servs., L.P., 430 S.W.3d at 394.  Only conduct that is "unequivocally inconsistent with claiming a known right" is sufficient to establish implied waiver by conduct. Van Indep. Sch. Dist. v. McCarty, 165 S.W.3d 351, 353 (Tex. 2005).  Prolonged silence or inaction may be enough to demonstrate the intent to waive a known right. Addicks Servs., Inc., 596 F.3d at 299 (citing Tenneco Inc. v. Enter. Prods. Co., 925 S.W.2d 640, 643 (Tex. 1996)).  Normally a question of fact, waiver can be determined as a matter of law only when the surrounding "facts and circumstances

are admitted or clearly established." <u>Crosstex Energy Servs.,</u> <u>L.P.,</u> 430 S.W.3d at 394.

Plaintiff argues that the payment clause "impose[d] a duty on [Defendant] to withhold payment (or at least object to) 'expenses' that it considered 'disputed' or not 'reimbursable' *within 30 days*."[90]   Plaintiff suggests that, as a result of Defendant's payment within thirty days of each of the invoice totals, Defendant impliedly waived any challenge the invoiced amounts.   Moreover, Plaintiff continues, Defendant waived its right to pursue its breach-of-contract claim in January 2016 when it affirmatively decided not to take action against Plaintiff after reviewing the invoices and supporting documentation.

Plaintiff's first waiver contention depends on flawed logic. The Consultant Agreement required Defendant to pay undisputed, reimbursable expenses within thirty days of submission.   The provision cannot be read to also require the converse, to wit, that Defendant pay only the expenses that were undisputed and reimbursable.   By Plaintiff's own admission, Defendant paid all undisputed, reimbursable expenses, thereby complying with the payment clause.   Because the clause did not require Defendant to challenge disputed, non-reimbursable expenses within thirty days, Defendant did not violate this provision by failing to raise

---

[90]   Doc. 61, Pl.'s Brief Supporting Mot. for Summ. J. on Def.'s Countercls. pp. 22-23.

objections within any thirty-day period.

On the other hand, the payment clause did not grant Defendant any "right" with regard to challenging amounts billed.  In fact, the clause granted Defendant no rights at all.  Absent a known right, the waiver doctrine is inapplicable.  Thus, the waiver provision of the Consultant Agreement, which required a signed writing to effectuate any waiver of a contract provision, was not triggered by Defendant's failure to challenge disputed, non-reimbursable expenses within thirty days of submission.  Likewise, Defendant could not have impliedly waived through payment a contractual right that did not exist.  To hold otherwise, not only fails the "known right" aspect of the waiver doctrine, but also defies the foundational principle that implied waiver through action exists only if the intent to waive is clearly demonstrated by the facts.  See Addicks Servs., Inc., 596 F.3d at 298.

Another flaw in Plaintiff's argument is that the obligation to pay within thirty days of submission applied, by its own terms, only to the payment of expenses, not to payment for personnel hours rendered.  All three of Defendant's categories relate to the billing of personnel hours—for travel time, for time over eight hours per day per employee, and for Vivian Drake's administrative tasks.[91]  The anticipated personnel hours for consultant services

---

[91]    Although Defendant complains of administrative and overhead expenses, it cites to personnel hours spent on administrative tasks.  The Consultant Agreement differentiates between expenses and personnel hours by assigning differing procedures for billing and paying.  The court finds that all three of

were paid in advance. Defendant cannot be held to have intentionally relinquished a known right to refrain from payment of unauthorized personnel hours when it paid $40,000 in advance. The Consulting Agreement required an end-of-the-month statement that reflected actual personnel hours spent but deferred a detailed review of the hours and charges accrued until the end of a quarter, at which time, Defendant either received a credit toward the following month's advance or paid the excess charges. Both the contract language and the procedure outlined therein for the payment of personnel hours evince that the parties did not intend personnel hours to be subject to the thirty-day payment requirement.

The time sheets are the only documents in the record that detail the tasks on which the actual personnel hours were spent. Plaintiff has not established when Defendant first reviewed the time sheets, but emails from Vivian Drake indicate that the time sheets were not sent to Defendant unless requested. The lack of detail in the invoices prevented Defendant's knowing acceptance of the charges upon payment. However, the evidence shows that Defendant reviewed the time sheets and the invoices in January 2016, near the date on which the Consultant Agreement terminated pursuant to its terms and discovered the allegedly improper charges. According to Horn, Defendant decided not to pursue any

the categories of overcharges fall under personnel hours.

billing dispute at that time.

The facts and circumstances of Defendant's decision clearly demonstrated that it did not choose to pursue any claim against Plaintiff in January 2016, but they did not clearly indicate the intent to permanently relinquish its contract claim against Plaintiff for improper billing.  Defendant made an internal business decision not to act *at that time*, but it did not take any affirmative steps or make any representations to Plaintiff. Defendant's decision to table those claims did not waive the right to later pursue them.

When the circumstances changed in early 2017 with the filing of this lawsuit, Defendant's cost-benefit analysis also changed. Although Defendant waited approximately six months after the filing of the lawsuit and more than a year after discovering the improper charges, Defendant was presumably still within the applicable statute of limitations.  See Jernigan, 111 S.W.3d at 157 (holding that a delay of more than 600 days in filing a motion for dismissal pursuant to a state medical liability act was insufficient to show waiver of the right to file the motion where the statute did not include a deadline and the inaction was not inconsistent with the intent to rely on that right).

While Horn's testimony regarding the decision not to pursue the claims in January 2016 is insufficient to warrant the court's finding of waiver as a matter of law, it is sufficient to raise a

fact issue on intent.  Other factual determinations related to the parties' communications and course of business concerning billing need to be resolved by the trier of fact before determining whether Plaintiff improper billed Defendant and whether Defendant intentionally waived a known right to challenge those improper charges.

Defendant's breach-of-contract claim related to billing survives summary judgment.

### IV.   Defendant's Motions for Summary Judgment

The parties disagree on which state's laws apply to this dispute, Texas or Montana.  In its live pleading, Plaintiff asserted that Montana law applies to promissory estoppel, equitable estoppel, breach of the contractual covenant of good faith and fair dealing, breach of surety obligations, constructive fraud, and negligent misrepresentation.[92]  In Defendant's live pleading, it contended that Texas law governed all state-law claims.[93] Defendant's pending motions concern Plaintiff's claims of negligent misrepresentation, breach of Uniform Commercial Code ("UCC") obligations, breach of surety obligations, equitable estoppel, breach of contract, constructive fraud, and breach of the contractual covenant of good faith and fair dealing and the damage

---

[92]     See Doc. 55, Pl.'s Third Am. Compl. pp. 11-15.

[93]     See Doc. 58, Def.'s 2d Am. Ans. & Countercl. p. 11.

claim for lost profits.[94]   After the filing of those motions,
Plaintiff withdrew its claims of breach of UCC obligations, breach
of surety obligations, and equitable estoppel.[95]

Throughout the briefing on Defendant's pending motions, the
parties continued to disagree as to what law should apply to
Plaintiff's remaining claims.  Defendant shortcuts the conflicts-
of-law process in its motion on lost profits, instead discussing
the applications of both Texas and Montana law and arguing that,
under either state's law, Plaintiff is not entitled to lost
profits.   The parties provided more in-depth discussion to
conflicts-of-law issues in the briefs on Defendants' other pending
dispositive motion concerning Plaintiff's claims.

Notwithstanding the parties' approaches, the court has no
intention of resolving Defendant's pending motions without first
making claim-by-claim determinations of whether Texas or Montana
law applies.  This process will not be straightforward given the
following factors: (1) the presence of a narrow choice-of-law
provision in the Consultant Agreement; (2) the extension of the
parties' relationship beyond the expiration of that contract into
new efforts related to the NDIC grant; (3) the mix of contract,
quasi-contract, and tort claims before the court; and (4) the

---

[94]    See Doc. 69, Def.'s Mot. for Summ. J. on Lost Profit Damages; Doc.
73, Def.'s Mot. for Partial Summ. J. on Pl.'s Cls.

[95]    See Doc. 76, Pl.'s Resp. to Def.'s Mot. for Partial Summ. J. on Pl.'s
Cls. p. 2.

possible application of statutory law. Yet, the conflicts resolution will have a significant impact on the case. The conflicts-of-law issue must be resolved before this case proceeds any further.

Considering the foregoing, the court **ORDERS** the parties to file conflicts-of-law briefs that address all of Plaintiff's remaining causes of action. The parties have evidenced knowledge of conflicts-of-law principals and are expected to apply those standards to the facts of this case. The initial briefs are due by August 28, 2018, and response briefs are due by September 11.

## V. Conclusion

As explained above, the court **RECOMMENDS** that Plaintiff's motion be **GRANTED IN PART AND DENIED IN PART.** Defendant's motions are continued pending conflicts-of-law briefs and analysis.

The Clerk shall send copies of this Memorandum and Recommendation to the respective parties who have fourteen days from the receipt thereof to file written objections thereto pursuant to Federal Rule of Civil Procedure 72(b) and General Order 2002-13. Failure to file written objections within the time period mentioned shall bar an aggrieved party from attacking the factual findings and legal conclusions on appeal.

The original of any written objections shall be filed with the United States District Clerk electronically. Copies of such objections shall be mailed to opposing parties and to the chambers

31

of the undersigned, 515 Rusk, Suite 7019, Houston, Texas 77002.

**SIGNED** in Houston, Texas, this 14th day of August, 2018.

_____
U.S. MAGISTRATE JUDGE